May it please the Court, my name is Gail Ivins and I am here today representing the Petitioner Appellant Brian Brim. As an initial matter, I want to apologize to the Court for my failure to comply with 9th Circuit Rule 22-1E. I have filed a Rule 28J letter this morning with the Court, specifically requesting that the Court consider certifying that question as it was briefed and also including the issue appropriately raised by the Government in their response that that issue is not, as I apparently had believed it was, included in the final petition that was considered by the District Court. And that therefore raises the issue of the propriety of the District Court's order denying the request to amend the petition to include that issue. Okay. Just so I'm clear on it, the uncertified issue, as I understood it, was to ask us to revisit whether Almendar's Torres v. the United States, the Supreme Court's decision is still good law after their decision? Or I guess probably more appropriately stated, whether a decision that an element or sentencing factor must be decided beyond a reasonable doubt is a watershed rule under Apprendi applying Apprendi, and therefore under Teague, is it applicable on collateral review? So it's basically saying Almendar's Torres, as it has been interpreted by this Court and many other courts, is seen to preclude this argument. But my argument is that Apprendi, as it was then later interpreted and applied in Blakeley, as the Supreme Court has consistently been interpreting and applying it, makes clear that the beyond a reasonable doubt requirement of Apprendi, which has to date not been considered by the Supreme Court, is a watershed rule and therefore is applicable on an initial petition on collateral review. But I realize that you've just stated much more artfully and eloquently than I how you would like the uncertified issue to read, but doesn't that really ask us to address whether Almendar's Torres is still good law? Yes, it does, Your Honor, which is obviously something that this Court cannot do other than to say, I'm sorry, Ms. Ivins, but I'd like you to address it to the extent of certifying it and ruling on it, which will allow me to take it to the Supreme Court. So you have your request in mind. Why don't you turn it into the issue that was certified? Yes, Your Honor, I would be happy to do so. On the issue that was certified, which is the ineffective assistance of counsel in connection with the plea, this is a very difficult argument to make, but it was certified and I am here to make it. And I think that my best argument is as follows. There are two separate pieces under Strickland. The first piece is the deficient performance. And this is not a mere inaccurate prediction case. This is not a question of just, did he get it right? Was it 360 to life? And, you know, maybe that's pretty close and maybe it's reasonably probable that that was correct, but that's not really what Mr. Brim is complaining of. He's complaining about the entire process by which he decided not to enter a plea. And that is the defense counsel's failure to have a meaningful conversation with him. The Court has before it the letter, which was written to Mr. Brim, which does not discuss the impact on him of a dismissal of one of the two 851 charges. That is a critical, critical fact for a defendant deciding whether or not to take a guilty plea. But, counsel, as I read the record, it appeared to me that Mr. Brim really wanted to go to trial and that would not have made a great deal of difference. Well, that becomes the important question, Your Honor, and I think actually concomitant with the fact that it is the defendant's decision, as we know from trial practice, whether or not to enter a guilty plea is the defendant's decision. That puts the burden on me, as his lawyer, to do a very, very good job of explaining to him what he's giving up by making the decision to proceed to trial. And my practice years go back to before mandatory minimums, and mandatory minimums really changed the scope of counsel's responsibility in that regard. It used to be zero to 20 was zero to 20. And the important thing to tell a client was, this judge is fairly lenient. This judge, you know, will be interested that you have a family that you need to support. This judge is going to give you a suspended sentence. He's going to max you out and put you on probation, and he's going to suspend it. We all long for the salaries, but the problem is that it's still the client's choice. And when I was representing clients, and I would give them the same advice you would, and then the client would look at me and say, I want to go to trial, even if I thought that was the dumbest response that my client could give, all I could do would be to tell him, that's the dumbest answer you can give me, and here's why you shouldn't make that decision. And Mr. Ross didn't do that, Your Honor. That is the problem that I see in this case. The reason that it's worth discussing today is that Mr. Ross did not do that. He wrote a letter. He had a brief conversation. He said, this isn't really even a plea offer. It is a plea offer. If Mr. Brim had received a 30-year sentence instead of the mandatory life, he would have gone home before his 60th birthday. Which, you know, I'm not 60 yet, so that doesn't sound so good, but at 61, that's going to sound really good. So I think that Mr. Ross had an obligation, and he was deficient in his performance to really lay out for Mr. Brim all of the options that would be available to the court should he take the plea. It's a big difference, whether it's mandatory life. And are you suggesting Mr. Brim didn't know that that was a big difference between – he didn't understand it? I think that in the record that no one – I don't think – I'd better go check that. I don't think anyone has challenged Mr. Brim's statement that he didn't understand that it would be 20 to life versus mandatory life, that what Mr. Ross said was it changes – he only was looking at the guidelines, and he said it would change a mandatory life to 360 to life. And he did not discuss in his letter or apparently in the conversation that this means he's dropping – the government is offering to drop one of the two priors, which now gives the court a lot more leeway to make a decision under the guidelines. There was no discussion about possible departures. There was no discussion about maybe how would we challenge this role in the offense, which I think is sort of the weak link in the government's argument. If we do what you want us to do, then you don't have to make a choice. You decide you're going to roll the dice, and you lose, and you say, uh-oh, I should have accepted. So the Court of Appeals has said I can do it, and we'll do it. Don't you understand the position? You're asking us to make law? I think that if – as I started out with, if I divide Strickland into two very separate pieces, and we look first at trial counsel's failure to do a good job of explaining the options, of explaining the impact – And that would come in the question of whether he was represented – whether his representation was competent. Once we answer that question, aren't we through? Well, no, because I need the second half of Strickland, because I need a reasonable probability that the outcome would have been different, and I think that the fact that the outcome is life, mandatory life, and it could have been something else, actually does satisfy, given the Supreme Court's decision in Glover saying that any time is important in a Strickland analysis, which I think calls into question Aiea v. Son and some of this Court's statements about gross mischaracterization. Counsel, maybe you could help me out. As I looked at all the possible sentences, because of his prior drug convictions, that under any configuration, his sentence was going to be 300 – where was it – 360 to life. As I stated in my brief, there's one configuration that I think is at least possible, which takes him down to a level 36, which is where we have to get to be below 360 to life, and that is the more conservative estimate on drug quantity under 30 kilograms, and not applying role in the offense. And the government's position is that it's clear from the plea agreement that he would have had a two-point enhancement under 3B1.1 for role in the offense. I've reread that plea agreement several times. I don't think it's that clear, that as between the four of them, based on those facts, he's a leader, manager, organizer, or supervisor. So I think it's at least probable or possible that the Court would not have imposed that in a plea situation. And I think it's important to look at – you plead guilty in a case and you end up with a life sentence. You know, I think the courts are somewhat inclined to look very reasonably at the factors to try to accomplish something less than life to encourage people to enter guilty pleas. So if it would be legally permissible to make that finding, I think the Court might have been inclined to make it, because otherwise there is no incentive to plead on these types of cases. One of the things that strikes me about this case, and it makes it a hard argument, I think, for you to make, is that this defendant was facing such a long term of imprisonment, that one way to look at this would be to conclude that, okay, they agreed to drop one prior, and maybe I only get a minimum of 20 years as opposed to 30, but it's still 20 years. And, you know, I could see where a defendant might think, why don't I roll the dice, because I'm going away no matter what if I take either of these pleas. Which is why it's counsel's job to do a very good explication of what this means. And I certainly, with my clients, go through, okay, so your child is going to be how old and graduate high school when, and you're not going to be there. Okay. But when they get married, you could be there if you take this plea agreement. But you understand my point, which is that as you get into the longer sentencing arena, it's harder for a client to think that a 5 or a 10 year difference is really all that significant. But I think life versus you get out some day is very significant. Thank you, Your Honor. Okay. Thank you, Ms. Ivins. Mr. Hirshman. May it please the Court. Brian Hirshman on behalf of the United States. The primary issue raised in this case is whether defense counsel rendered an effective assistance where he accurately advised defendant of the plea offer, the potential consequences of the plea offer, the advantages and disadvantages of the plea offer. Defendant weighed those and made his own independent decision that he wanted to roll the dice and proceed to trial. And under those circumstances, is the United States magistrate judge and the district court correct in finding that it's not an effective assistance of counsel to allow your client to make such decisions, even if in hindsight it turns out that you end up with life in prison instead of 360 months to life? And the answer has to be that that decision, because the consequences are suffered by the defendant, has to be the defendant's to make. And I'd like to start off by talking about the fact that Mr. Ross did explain to the defendant what the potential consequences were and that he accurately explained it. And I think to start with that, it's important to look at the letter that Mr. Ross did address with Mr. Brim in person and then Mr. Ross' own testimony that he went through that letter, he went through the guidelines, and he explained the facts. And the letter states that what's going to happen under this plea offer is you're going to go from a mandatory life, which is what actually occurs when you have two priors, and with the dismissal of the prior, instead you're going to have 360 months to life. And under any scenario, as I laid out in my brief, that was correct. 360 months to life is what Mr. Brim was facing. And that is a lot of time under the guidelines. And Mr. Brim has himself admitted that he was not willing to accept such a plea offer. He said that on several occasions, and to this date it is important to note that Mr. Brim did not accept a 360-month-to-life plea offer. What Mr. Brim indicated in his declaration was if it were just going to be 20 years, and again, this is hindsight after the conviction when he's already received life, if it were going to be 20 years, I would have accepted that. But he's never once ever said that he would accept the plea offer that was on the table, 360 months to life. And that gets you that even if Mr. Brim could survive the first prong of Strickland and find it was ineffective assistance because he didn't force him to accept the plea offer, he didn't want to accept, which I do not believe is the law. But even if that were the case, because Mr. Brim under the prejudice prong has never said he would accept 360 months to life, and that was the offer, there really has been no prejudice to Mr. Brim. I don't know whether we can decide the case on that and what he said or didn't say. But what I think he argues is that it wasn't clear that he was looking at a mandatory life as opposed to life, and that the letter from the lawyer, nor anything that the lawyer said made it clear to him that there's a difference, a major difference, between life and mandatory life. Well, I think the last line of the letter, and... That's our argument. Right. Do you agree? I think... Do you agree that's our argument? I... Then tell us why she's wrong. Okay. The argument's wrong because in the context of the letter and in Mr. Ross's own interview, which was subsequently part of the record, it became clear that he did explain that to Mr. Ross. The interview, you mean his testimony by telephone? Well, there was also an interview of Attorney Ross, which is a government's ER-96, which was submitted as part of the record and adopted as part of the findings, where Mr. Ross was interviewed in advance of the hearing and submitted as part of the government's opposition to the 2255 motion, and in there, Mr. Ross explains that he took the guidelines with him to meet with Mr. Brim at the Metropolitan Detention Center, where Mr. Brim was in custody, that he sat down with him, that he walked him through the guidelines, he explained the various options, and then Mr. Brim said that he wanted to go to trial. He did not want to accept the plea offer, and Mr. Brim also says that if you look at ER-28, where Mr. Brim submits his initial motion pro se in the 2255 and he says, I looked at the letter, it left open departure issues, I didn't want that, and so I rejected the plea offer. And if you look at Mr. Ross's letter, what he says is, the effect of the plea bargain is to reduce a life without release sentence. Life without release means mandatory life. You have no options here. You're going to get life imprisonment to a 360-months-to-life sentence, which is exactly what the plea offer did. By dropping the prior, it reduced it from a life without release sentence, mandatory life, to a 360-months-to-life sentence, which it did. Now, whether or not Mr. Ross in the letter explained the whole nature of Section 851 and how one prior versus two priors has some effect is not relevant or dispositive on the issue, because he explained the effect of the dropping of the one prior. In other words, if you have two priors, you will have a life without release sentence. Period, end of story, mandatory life. If they agree to dismiss the prior, you're going to have a mandatory minimum of 20 years. The guidelines are going to call for 360 months to life, so that is what your likely sentence will be. So, is the argument the letter doesn't contain all the information that the attorney shared with his client, that you have to consider that in conjunction with the testimony that the attorney gave as to what they talked about when he went to the MDC and explained his options? I think the letter on its face is sufficient in any event, because whether or not he explained the reasons why it changes from a mandatory life to a 360 months to life, as long as he explains the relevant issue, which is that it does do it, the legal reasons why it may or may not happen are irrelevant to the ultimate decision of whether or not you're effective. My question, Mr. Hirschman, is a little broader than that. This puts defense counsel in perhaps the most uncomfortable professional position that you after the case has been resolved, you now become a witness against your client based upon advice that is at the heart of confidential attorney-client communications. I would not expect, and I certainly, when I wrote these letters, never put into my letters everything that I told my client. I mean, that's one of the reasons why we want to interview or take testimony from the lawyers, but it still puts a lawyer in a very awkward position. But that's what we do. And the magistrate judge here, I assume, considered everything, both the letter and the testimony of the lawyer, as to what the client understood at the time the decision was made. That's accurate. That is accurate, and you need to take a look at the entire picture to understand. But I think my point was, in terms of just the letter on its face, I think it also is sufficient in and of itself to have accurately conveyed the most significant aspects of the government's plea offer and the advantages and disadvantages. But I do agree with the court that you do have to look at the entire context when looking at whether or not the attorney was effective or ineffective. And in doing that, as the magistrate judge did, you look at all of the evidence before you, which would include the attorney's testimony about what occurred, the letter, any interviews or other information that had been provided with respect to what the attorney did. And certainly, when you look at the entire package, it becomes clear that Mr. Ross was and did provide effective assistance in explaining the advantages and disadvantages of the potential plea offer. And at the end of the day, I think the court is correct in saying that decision has to be made by the defendant, who is facing 360 months to life in prison, or whether that person wants to take the chance of potentially being acquitted at trial. Well, counsel, you said, I'm sorry, the letter speaks for itself. When I read the last sentence, the effect of the plea bargain is to reduce the life without release sentence to a 360 months to life sentence. To be absolutely clear, should have added, with a possibility of release. Whether that's as clear as it could be is a question in my mind, whether it speaks for itself. The 360 months to life sentence with a possibility of release. But I think the nature of the, since it was 360 months, I think he could have, and again, that's probably got to be in the context of all the discussions that they had about the possibility of being released. But the possibility of getting 360 months would entail the possibility of release. And I think it's accurate to put on the other end the life sentence, because under the guidelines, under level 37 or above, it says 362 life. So that is the accurate, I believe, description of what the guide. Well, it's an accurate legal description, but if I'm a lay person, I'm not sure that the significance of that is clear. Right. Although I think that the court could have still imposed the high end of the guideline, even without the 851 enhancement and ordered life sentence. It's probably unlikely. Well, I mean, part of the problem here is there's a difference between the California state and federal sentencing. There is no parole in the federal system anymore. So a 360 month sentence means he gets, what, 54 days of good time credit per year for each year that he serves. Right. So it's not like he gets a chance to get out any earlier than 330 years times 54 days subtracted from 360 months. That's when he's eligible for relief. It is a very significant amount of time that this defendant was facing if he chose to accept the plea offer. And by defendant's own admission, that's one of the reasons why he says, I'll take my shot at acquittal. And then in hindsight, when it looks better to have taken a plea offer, although, again, I would point out that never has defendant ever indicated in any declaration or anything submitted to the court that he would have accepted a plea offer of 360 months to life. Never. Mr. Hirschman, do you know what the BOP does with a life sentence? Well, how do they calculate the mandatory release date? Do they do it on a 30-year sentence? I think that's the answer, but I'm not sure. I would suspect that they do not. I would suspect that a life sentence is essentially life without possibility of early release. But I do not know that. I don't think so when you're looking at a 360 to life. I mean, it used to be back in the salad days that everybody knew that at a third of the sentence, you would then be considered eligible for parole consideration. But I think they have to set a date, and I think they pick a 30-year, but I don't know. I mean, I don't know, but if that were the case, wouldn't it be then there would be no difference between 360 and life? Right. For the administrative purpose of determining when he would first come up for release consideration. That could be accurate, and I apologize. I just don't know the answer to that. It's a ministerial function that some minion in the Bureau of Prisons does, and I just don't know the answer to that. Thank you, Mr. Hershman. Thank you. What do we have to decide to reach the results you want us to reach? Well, I think that first you can look at ER 266 through 268. That's the magistrate judge's discussion of the conversation between Mr. Brim and his attorney, and I think that we then get what Mr. Hershman said, which is we're going to look at the letter in terms of what was said. And I think that there are two things. One is I think the court is right, and maybe Mr. Hershman and I could find out the answer to that question, but that's always been my understanding is that it would be treated as 30 years, and it would be about 25 and three quarters years before he was released, which is a lot sooner than never. And the effect of the CLEA agreement was not to change mandatory life to 360 to life. They're mixing apples and oranges. One is, as the court discussed in the argument before me, mandatory minimums and statutory provisions, and one is guideline provisions. And so the answer is what the plea offer did was change mandatory life to 20 to life. And then there's a further sentence. This is, however, under the sentencing guidelines, here's what might happen. And it's not by any means certain that it was going to be 360 to life. I just don't accept that based on what the government's plea offer said. And so it may have been 360 under the guidelines, but the statute would not have required a sentence above 20 years. And that gives a lot of room to have that discussion about what's appropriate. What you have to do to get to where I want to be is find that Mr. Ross was ineffective because he did not explain that to Mr. Brim. He did not explain the difference between statutory mandatory life and statutory 20 to life, and what he could or couldn't do with the guidelines to get a sentence that was below mandatory life. And then you need to find that it matters, that there's a reasonable probability that the result would have been different. And I think that under Glover, saying that any amount of time under Strickland now matters, that that's satisfied in this case. Thank you very much. Thank you. The case that's argued is submitted very helpful, and we will next hear argument in McSherry v...
judges: Farris, D.W. Nelson, Tallman